**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RONALD PROCTOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1243-JJF |
| | ) | |
| C/O COVENTRY, SGT FAUST, | ) | |
| LT. SALAS, LT. JOHN DOE I, | ) | |
| DR. BROWN, BRIAN ENGREM | ) | |
| | ) | |
| Defendants. | ) | |

**STATE DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS/SUMMARY JUDGMENT**

**STATE OF DELAWARE<br>DEPARTMENT OF JUSTICE**

/s/ Lisa Barchi
Lisa Barchi  #3927
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
lisa.barchi@state.de.us

Attorney for Defendants

DATE: December 19, 2005

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RONALD PROCTOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-1243-JJF |
| ) | |
| C/O COVENTRY, SGT FAUST, ) | |
| LT. SALAS, LT. JOHN DOE I, ) | |
| DR. BROWN, BRIAN ENGREM ) | |
| ) | |
| Defendants. ) | |

**STATE DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THEIR MOTION TO DISMISS/SUMMARY JUDGMENT**

**I.  Introduction**

This latest lawsuit filed by Plaintiff alleges the imminent danger exception, pursuant to 28 U.S.C. § 1915(g).  Plaintiff has filed numerous lawsuits in the past, at least six of which the Court has found to be frivolous.[1]  Because he has filed more than three frivolous lawsuits, Plaintiff is ineligible to request *in forma pauperis* status.[2]  Plaintiff may only proceed *in forma pauperis* if he claims he is in imminent danger of serious physical injury.  Plaintiff's allegations in this case involve his claim that Defendants violated the Eighth Amendment by using excessive force and failing to protect him from harm by correction officers.  In his amended complaint Plaintiff claims he was denied access to the courts.

---

[1] With a history of filing over fifteen lawsuits in the U.S. District Court alone, Plaintiff can be charitably described as a vexatious litigant.

[2] *See Proctor v. Scott*, Civil Action No. 88-415-MMS (*dismissed* December 12, 1988*); Proctor v. Watson,* Civil Action No. 88-417-MMS (*dismissed* December 12, 1988);  *Proctor v. Haley*, Civil Action No. 88-418-MMS (*dismissed* December 12, 1988); *Proctor v. Avanzato*, Civil Action No. 88-420-MMS (*dismissed* December 12, 1988); *Proctor v. Gaddis*, Civil Action No. 88-421-MMS (*dismissed* December 12, 1988); and *Proctor v. Brasure*, Civil Action No. 01-013-JJF (*dismissed* January 8, 2001).

Defendants refer to matters outside the pleadings, therefore the Court may treat its motion to dismiss as one for summary judgment. *See* Fed. R. Civ. P. 12(b)(6); *Camp v. Brennan*, 219 F.3d 279, 280 (3rd. Cir. 2000) (consideration of matters beyond the complaint converts a motion to dismiss into a motion for summary judgment). Defendants George Coventry, William Faust, John Salas and Brian Engram contend that they are entitled to judgment as a matter of law because there are no genuine issues of material fact in dispute. *See Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'"). Defendants assert that Plaintiff has not made, and cannot make a sufficient showing of the essential elements of his case for which he carries the burden of proof. Therefore, dismissal is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In addition, Defendants state, that unless there is sufficient evidence to enable a jury reasonably to find for the nonmoving party on the factual issue, summary judgment should be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**II.     Statement of Facts**

In the early morning of August 17, 2004, Plaintiff twice failed to obey a direct order from correction officers. This Complaint is Plaintiff's latest tale of the consequences of his failure to turn over contraband  From Plaintiff's expletive encrusted statement of his case, the following allegations can be gleaned.

On August 17, 2004, Plaintiff was walking on the tier when he was stopped by a correction officer, who demanded to see what he was carrying. When Plaintiff did not answer right away (claiming he had a mouth full of toothpaste), the officer spoke to him again, wanting an answer. Plaintiff alleges that just as he finished spitting out the toothpaste, correction officer

3

Coventry hit him on the right side of his chest then "turning me and then strike me into [sic] my chest with both hands striking me with enough force that drove me into the fence area." (Complaint, Statement of Facts). While this was occurring, Plaintiff yelled at the officers and threatened them. Plaintiff claims that officer Coventry took the item out Plaintiff's hand and opened and read the item.

Plaintiff goes on to proudly claim that he cursed and threatened the officers further. At that point Plaintiff claims that correction officer William Faust "striked [sic] my middle chest area with enough force that caused me alarm." (Complaint, Statement of Facts). Plaintiff continued to yell at the officers and claims that officer Faust hit him again in the chest area.

Plaintiff claims that the officers attempted to make body contact with him as they walked him back to his cell. (Complaint, Statement of Facts). Plaintiff admits that it wasn't until fifteen minutes later that the other inmates returned to the tier, yet Plaintiff claims they told him they saw what happened. (Complaint, Statement of Facts).

Not surprisingly, Defendants have a different perspective of the events. Early in the morning of August 17, 2004, correction officer Coventry noticed a letter in Plaintiff's pocket as the inmates were being taken to the chow hall. (*See* Incident Reports written by George Coventry and William Faust attached as Exhibit "A"). When officer Coventry twice asked Plaintiff what he had, Plaintiff first did not respond, and then mumbled and waived the officer off in a dismissive manner. Officer Coventry ordered Plaintiff to stop and give the officer what he was carrying. (Exhibit "A"). When officer Coventry tried to grab his arm and stop him, Plaintiff snatched his arm away and cursed at the officer. (Exhibit A). At that point, seeing the disturbance, Sargant Faust came over and Plaintiff was pushed against the fence. The letter was taken from Plaintiff while he continued to fight the officers. (Exhibit A). Plaintiff was

4

repeatedly warned to stop resisting and comply with orders. Plaintiff continued to resist and admits in his Complaint that he used profanity and threatened the officers personally. (Complaint, Statement of Facts).

 Plaintiff's complaint mentions that he went to a medical appointment after the incident. The records of his medical appointment that day do not mention him asking anyone to evaluate the alleged injury to his chest. The incident occurred early in the morning and the note in the medical record was made at 9:30 A.M. (*See* Progress notes dated August 17, 2004 at 0930 attached as Exhibit "B"). Further, in the month following Plaintiff's exchange with the correction officers, there is no mention in his medical record of any injury to his chest. (*See* Progress notes attached as Exhibit "C").

 Plaintiff claims that the correction staff started harassing him on August 8, 2004. However, a review of incident reports shows only three incidents between August 2, 2004, and August 17, 2004. (*See* Incident Report log attached as Exhibit "D"). The incidents involved Plaintiff's loud, disorderly behavior while in the law library (August 2, 2004), his failure to obey an order and walking out of the chow hall without permission (August 9, 2004), and being away from his assigned area against orders (August 13, 2004). (*See* Incident Reports attached as Exhibit "E"). No disciplinary action was taken regarding the library incident, and for the August 9th and 13th incidents, Plaintiff lost all privileges for 24 hours. (Exhibit E).

 On August 19, 2004, just two days after the incident which is the focus of Plaintiff's Complaint, he again took mail out of his cell on the way to chow hall. This time he put it in the mail box. Later the mail was collected and some mail was taped closed and was being sent to another inmate. (*See* Incident Report attached as Exhibit "F").

 ***August 18, 2004 to September 7, 2004***

5

In the month following Plaintiff's August 17th exchange with officers, there were seven incident reports filed regarding plaintiff. ( Exhibit D). In one incident report, dated September 6, 2004, Plaintiff told Luietenant Salas about his complaints concerning how William Faust and George Coventry treated him and censor the mail. (*See* Incident Report number 1015368 attached as Exhibit "H"). The other incident reports concern contraband found in Plaintiff's cell and at which time he cursed at and threatened William Faust with a lawsuit (September 6, 2004), cursing at the nurse (September 6, 2004), and having items in excess of the allowed amount in his cell (September 9, 2004), among other things. (*See* Incident Reports from August 28, 2004 to September 9, 2004 attached as Exhibit "H"). During that time period, only two incident reports were generated by William Faust, one on September 5, 2004, and the other on September 6, 2004. No reports were generated by George Coventry. On September 7, 2004, this lawsuits was docketed in the United States District Court. (D.I. 2).

*Access to the Courts*

Moving on to Plaintiff's amended Complaint, he claims he has been denied access to the courts since February 3, 2005, and adds Brian Engram, a paralegal in the law library at DCC, to the list of defendants. (D.I. 16). Plaintiff has used the law library services on countless occasions since January 1, 2005. (*See* Affidavit of Brian Engram and log of law library use attached as Exhibit "I"). He has also received stationary, pens and paper at no cost. (Exhibit I). Plaintiff has used the services of a Notary twenty seven times since January 1, 2005. In addition, Plaintiff has made 3,833 pages (over 7 reams of paper) of copies since January 1, 2005.

**ARGUMENT**

I. **PLAINTIFF DOES NOT MEET THE STANDARD FOR "IMMINENT DANGER" AND SHOULD NOT BE ALLOWED TO PROCEED *IN FORMA PAUPERIS* BASED ON THIS EXCEPTION.**

Plaintiff is ineligible for *in forma pauperis* filing status because he has set forth no facts establishing that at the time of filing his Complaint he was in imminent danger of physical injury as required by 28 *U.S.C.* § 1915(g).  To prevail on a claim of imminent danger, the plaintiff must establish that the danger was "'imminent' at the time the complaint is filed." *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 312 (3rd Cir. 2001).  The Court in *Abdul-Akbar* held that imminent dangers "are those dangers which are about to occur at any moment or are impending…not those harms that had already occurred." *Id.* at 315.  The focus is "on the risk that the conduct complained of threatens continuing or future injury not on whether the inmate deserves a remedy for past misconduct." *Martin v. Shelton*, 319 F.3d 1048 (8th Cir. 2003).  In the instant case, Plaintiff describes profanely and at length an event that occurred three weeks *before* he filed this lawsuit.  The events of August 17, 2004 did not cause any known injury to Plaintiff, nor were the events ongoing.

Plaintiff is seeking redress for past events, and does not describe or provide any evidence of future or ongoing threats of serious physical injury.  Plaintiff's Complaint in this case was docketed on September 7, 2004.  His Complaint gives his version of an event that occurred three weeks prior to filing the Complaint on September 7, 2004.  The Complaint focuses on Plaintiff's active refusal to obey an order and his admitted threats to correction officers.  It does not mention any "imminent danger" of serious physical injury Plaintiff may have believed he faced after that date.

From the documentation attached to this Motion to Dismiss, it can be inferred that Plaintiff suffered no injury on August 17, 2004, and was not in imminent danger between August 17, 2004 and September 7, 2004.

Other than his bald accusation of harassment starting a week before the events of August 17th, Plaintiff provides no details or evidence of harassment. Evidence, in the form of the incident reports the incident reports indicates that there were a total of three incidents in August, 2004 prior to August 17th. They involved Plaintiff's disorderly behavior in the law library, and deliberately disobeying orders. This evidence shows that even when Plaintiff provokes incidents, he does not suffer severe consequences. No one made him yell and act out in the library, and no on forced him to be off limits and disobey a direct order. In other words, all of these acts were self-motivated by Plaintiff and not the result of anyone harassing him. In each of these incidents Plaintiff did not face any physical threat by the correction staff. For disobeying orders ands being in off-limits areas he lost privileges for 24 hours.

During the events of August 17, 2004, Plaintiff again actively disobeyed a direct order from the correction officers, forcing them to physically take contraband away from him. The correction officers tried to grab Plaintiff's arm to stop him, and when he pulled away, they pushed him against a fence. It can be inferred that the correction officers' recitation of events is accurate, because they say they pushed him, and Plaintiff admits that officer Coventry used both hands when pushing him against the fence. In addition, Plaintiff admits cursing at them and threatening them. Most importantly, not only is there no indication of serious injury, there is no indication of any injury. There is no indication in the progress note written by the nurse who saw Plaintiff at 9:30 A.M. that day, that Plaintiff ever mentioned any injury to his chest. The incident occurred in the early morning hours. If Plaintiff showed the nurse his chest, it is likely that by 9:30 A.M. there would be some bruising, if Plaintiff was hit in the manner he alleges. However, there is no evidence to suggest that Plaintiff ever said anything to the nurse about an injury to his chest. It can be inferred from this evidence that Plaintiff said nothing to the nurse,

because he suffered no injury and had no visible signs of any injury from his early morning encounter with the correction officers.

Plaintiff provides no evidence that he was under a continuing threat of serious physical injury after August 17, 2004. Not once, on any of the seven occasions between August 18, 2004 and September 9, 2004 Between August 18, 2004, when incidents occurred involving Plaintiff, did he ever have a physical confrontation with any of the correction staff. These incidents include the time he threatened correction officer Faust with a lawsuit, and when he complained to John Salas about William Faust and George Coventry. (Exhibits G and H). In fact, only two of the incident reports show involvement by Williams Faust, and none of the reports detail any injury to Plaintiff. Further, Plaintiff does not say one word in his Complaint about any threats, physical or otherwise, from the defendants between August 18, 2004 and September 7, 2004.

Plaintiff details the events of one morning three weeks before he filed this lawsuit. He provided no evidence that there was any future or ongoing threat of serious physical injury. Therefore, Plaintiff has failed to establish that he meets the standard for the imminent danger exception to 28 *U.S.C.* § 1915(g), and thus should not be given *in forma pauperis* status in this Court.

## II. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE EIGHTH AMENDMENT FOR WHICH RELEIF CAN BE GRANTED.

Not only does Plaintiff fail to articulate in any manner what constitutional right he feels was violated, he provides no evidence that he was deprived of a constitutional right by the prison officials. Therefore, Defendants are left to guess what violation he alleges, and can only respond in general terms. For his failure to articulate what constitutional right be believes was violated, Plaintiff's claim should fail for not stating a claim on which relief can be granted.

In order to prevail in his Section 1983 claim, Plaintiff must demonstrate that the prison officials, acting under the color of state law, deprived him of a constitutional right. *See* 42 U.S.C. § 1983. In 2004, when the incident occurred, the defendants were correction officers at the DCC, a state facility. Defendants contend that they did not violate Plaintiff's constitutional rights under the Eight Amendment by subjecting him to cruel and unusual punishment by failing to protect him.

Plaintiff does not indicate who failed to protect him or provide any evidence of how the person or persons failed to protect him. (*See* Complaint, Relief section). An incident report on September 6, 2004 indicates that Plaintiff spoke to John Salas about correction officers Coventry and Faust. However, this discussion presumably occurred after Plaintiff submitted his Complaint to the Court, as the Complaint was docketed on September 7, 2004. Therefore, Plaintiff's allegation that someone failed to protect him is unclear can only be answered in general terms. While prison officials do have a duty to protect inmates from violence by other inmates, nowhere does the law demand that the officials guarantee an inmate's safety, as Plaintiff claims in his Complaint in paragraph nine. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

Plaintiff fails to meet both the subjective and objective standard required to establish a viable Eighth Amendment claim. To prevail in an Eighth Amendment claim alleging a failure to protect, the plaintiff must demonstrate that:

> [T]he alleged deprivation must be objectively "sufficiently serious." Thus, where the alleged violations can be described as a failure to prevent harm, the inmate must show that his or her conditions of incarceration posed a "substantial risk of serious harm." Second, the prison official's state of mind must be one of "deliberate indifference" to the inmate's health or safety.

*Carrigan v. Delaware*, 957 F. Supp. 1376, 1381 (D. Del. 1997)(citing *Farmer v. Brennan*, 511 U.S. 825, 833-35 (1994). In his Complaint Plaintiff does not show that his

encounter with the correction officers on August 17, 2004, when he failed to obey a direct order, was a sufficiently serious deprivation of his constitutional rights, and that the enforcement of the order posed a substantial risk of serious harm to him.

Plaintiff does not state any circumstances that meet the objective threshold of a "substantial risk of serious harm."  Plaintiff does not provide any evidence that there was a substantial risk of serious physical harm to him from any of the correction staff either on August 17th or after.  On the contrary, incident reports dating to September 9, 2004 and the medical record of August 17, 2004, indicate no substantial risk of serious harm to Plaintiff.

Next, Plaintiff cannot prove that the harm he suffered, if he suffered any injury on August 17, 2004, was serious.  The medical record indicates that while Plaintiff was seen by a nurse on August 17, 2004, it was for another medical matter, and he did not mention any injury to his chest.

In addition to his failure to meet the objective threshold component of "substantial risk of serious harm," Plaintiff fails to demonstrate the subjective component of deliberate indifference on the part of the prison officials.

In *Farmer*, the Supreme Court enunciated the elements required to show deliberate indifference by the prison officials. Plaintiff must show that the prison official "knows of and disregards an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837.  Plaintiff must have "*actual knowledge of a substantial risk of serious harm*." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).  That a prison official has actual knowledge of a substantial risk can be show through "inference from circumstantial evidence…and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  Plaintiff does not show who was supposed to have actual knowledge of a substantial

11

risk of serious harm in this case.

Plaintiff fails to show either actual knowledge of a substantial risk of serious harm and draw the inference that that the risk was disregarded. Knowledge can be inferred where the risk is obvious. *Farmer*, 511 U.S. at 843. However, "it is not enough that that the official 'should have known' of a substantial risk or that a reasonable officer in the situation would have known of the risk." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

Defendants contend that there was no risk to Plaintiff. There is no identifiable significant threat presented by Plaintiff in his Complaint. Plaintiff does not provide evidence of an ongoing or future threat, and none can be found in any documentation of incidents involving Plaintiff. That physical force was used to make Plaintiff hand over contraband is not the deliberate indifference to a substantial risk of harm contemplated in the Eighth Amendment.

### III.    PLAINTIFF DID NOT SUFFER FROM EXCESSIVE FORCE

Correction officers, in trying to maintain order, and handle what appeared to be Plaintiff's escalating rage, did not use excessive force to take contraband from Plaintiff after he refused to give it to them. Whether incidents alleging excessive force are constitutionally actionable "turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citations omitted). *See also Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

The Third Circuit has enumerated several factors to consider in determining whether excessive force has been applied in a § 1983 action: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably

12

perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response. *See Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (applying *Hudson v. McMillian*, *supra*).

Plaintiff's statement of facts in his Complaint shows his escalating rage and lack of control when confronted by correction officers. "[O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S. at 6. While weighing these competing concerns, officials must make decisions as to the use of force "in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. at 320. Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Where prison officials use force to address a prison disturbance, the question of whether the force used inflicted unnecessary and wanton infliction of pain turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-321. Not every "malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. The Eighth Amendment's prohibition against cruel and unusual punishment excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." *Whitley*, 475 U.S. at 327. The actions taken by correction officers on August 17, 2004 are an example of the type of force envisioned by the Supreme Court as *de minimus*.

Comparison of Plaintiff's statement of facts in his Complaint and the incident reports

prepared by the correction officers show there is agreement about the facts. First, Plaintiff admits he did not respond to the officer when asked what he had, and admits that he walked away from the officer when asked a second time to hand over the contraband. The incident reports also note that Plaintiff failed to respond twice, walking away from the officer after the second request. Plaintiff's rather odd excuse for his action is that he had a mouth full of toothpaste. Second, Plaintiff claims that officer Coventry struck him on the right side of his chest. The incident report states that the officer reached out to grab Plaintiff's arm and Plaintiff jerked his arm away. Third, Plaintiff states that the officer struck him with both hands, pushing him into the fence. The incident report states that Plaintiff was pushed up against the fence. Plaintiff admits "that was when I took a step saying 'Im [sic] going to report all youe [sic] asses to the Lt.'" and claims that officer Faust struck him in the chest "with enough force that caused me alarm." (Complaint, Statement of Facts). Plaintiff claims that as he moved away from the officers, he was struck again in the chest by officer Faust. The incident report states that Plaintiff continued to resist giving up the contraband. Finally, Plaintiff goes on to describe in excruciating detail how he reacted with more profanity and threats to the officers. The incident report states that Plaintiff was using profanity and described the threats.

      When using the Third Circuit's criteria to evaluate the use of force in this case, the events of August 17th do not add up to excessive force. It is agreed that the officers warned plaintiff twice to stop and hand over the contraband. This is evidence that they were trying, in good faith to maintain discipline, and not to maliciously cause harm. The force was needed because Plaintiff twice refused to respond to the officers. The amount of force used was *de minimus*. Both officers and Plaintiff agreed that Plaintiff was pushed into the fence. No mention is made of any injuries sustained by Plaintiff when he had an appointment with the nurse later the same

morning, indicating that Plaintiff was either not injured. The officers acted reasonably to enforce rules and maintain order when they forced Plaintiff to turn over contraband. To simply allow Plaintiff to walk away without responding to them undermines the authority of the correction staff. The correction officers tempered the forceful response by taking Plaintiff back to his cell, cutting off the confrontation. Using the Third Circuit's criteria, there is no evidence that correction officers used excessive force when confronting and then subduing Plaintiff.

IV. **DEFENDANT ENGRAM DID NOT DENY PLAINTIFF ACCESS TO THE COURTS.**

Plaintiff simply alleges in his amended Complaint that he has been denied access to the courts and names Brian Engram as a defendant. Plaintiff's statement does not provide any intelligible information to form the basis for this allegation. Therefore, other than to compile information on Plaintiff's use of the law library, Defendant Engram cannot respond to this bald accusation. (Exhibit I). Plaintiff's unsupported allegation fails to state a claim for which relief can be granted, and should be dismissed.

V. **THE DEFENDANTS ARE IMMUNE IN THEIR OFFICIAL CAPACITIES.**

The Plaintiff's amended complaint (D.I. 10) names the Defendants in their official capacities. The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." While the Amendment does not facially bar suits against the State by its citizens, the United States Supreme Court has held that in the absence of consent, a state is "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). "The Eleventh Amendment limits federal judicial power to entertain lawsuits against a State and, in the absence of congressional abrogation or consent, a suit against a state agency is proscribed*.*" *Neeley v. Samis*, 183 F. Supp. 2d 672, 678 (D. Del. 2002) (*quoting Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98-100 (1984)). The United States Congress can abrogate a state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive the states' immunity will produce this result. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996)*.* No such clear intent can be seen in 42 *U.S.C.* §1983. In fact, a review of the statute demonstrates that Congress did not intend to waive the states' immunity. The statute facially allows suits only to be brought against "persons." 42 *U.S.C.* §1983. Neither the State of Delaware, nor agencies or officials of the State of Delaware are "persons" as contemplated by 42 *U.S.C.* § 1983.

A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the Defendants in their official capacities are not "persons" for the purposes of 42 *U.S.C.* § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, given this categorization, this Court lacks jurisdiction over the Defendants in their official capacities, and Defendants are outside the class of persons subject to liability under 42 *U.S.C.* § 1983. Accordingly, the Defendants are entitled to summary judgment regarding any official capacity claims.

**VI.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

The doctrine of qualified immunity protects government officials from civil liability insofar as their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects officials from the personal cost of litigation and the attendant inhibiting effect litigation has on the proper discharge of their official responsibilities. *Lee v. Mihalich*, 847 F.2d 66, 69 (3d Cir. 1988).

The Supreme Court has announced unequivocally that the District Court, at the earliest possible stage of litigation, must consider the defense of qualified immunity under a legal standard separate and apart from its analysis of the underlying claim itself. These two analyses are not susceptible to fusion, and cannot be left for factual resolution by the trier of fact. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The first question before the Court in a qualified immunity analysis is whether, taken in the light most favorable to the party asserting injury, the facts show that the prison officials' conduct violated a constitutional right. *Brosseau v. Haugen*, 125 S.Ct. 596, 598 (2004)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). For the reasons set forth above, Plaintiff has failed to provide any evidentiary support to any of his alleged constitutional violations. In addition, Plaintiff's claims also suffer from several legal defects as set forth above. Plaintiff fails to make out a constitutional violation.

The next stage of the qualified immunity analysis requires the Court to ask whether the constitutional right allegedly violated was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable prison official that his conduct was unlawful in the situation he confronted." *Id* at 202. The "contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court must ask whether a reasonable public official would know his or her *specific conduct* violated clearly established rights. *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996). "The 'salient question' is whether the state of the law at the time of the challenged conduct gave defendants 'fair warning' that their action was unconstitutional. *Black Hawk v. Pennsylvania*, 225 F.Supp.2d 465, 480 (M.D. Pa. 2002)(*quoting Hope v. Pelzer*, 536 U.S. 730,741 (2002)(articulating the "clearly established" inquiry to require that an official have 'fair warning' that the alleged activity engaged in was unconstitutional)).

Plaintiff's claims are based on heretofore unrecognized legal rights based on chimerical guarantee of protection. Nothing in the record supports a finding that any of the defendants ever engaged in any conduct which violated Plaintiff's rights. Additionally, Plaintiff's vague statements in his letters to prison officials fail to allege how any Defendant's *specific conduct* violated his clearly established rights. Assuming *arguendo* Plaintiff's ability to support any violation of any constitutional right, there is no legal authority which would provide the Defendants with "fair warning" that their alleged activities were unconstitutional. Accordingly, the Defendants are entitled to the defense of qualified immunity and summary judgment in their favor.

## CONCLUSION

For the foregoing reasons, Defendants Holman, McGuigan, and Sagers respectfully requests that this Honorable Court enter an order dismissing Plaintiff's claims against them with prejudice.

                                                **STATE OF DELAWARE**
                                                **DEPARTMENT OF JUSTICE**

                                                           /s/ Lisa Barchi  
                                                           Lisa Barchi  #3927  
                                                           Deputy Attorney General  
                                                           Carvel State Office Building  
                                                           820 N.  French Street, 6th floor  
                                                           Wilmington, DE 19801  
                                                           (302) 577-8400  
                                                           lisa.barchi@state.de.us

                                                           Attorney for Defendants

DATE: December 19, 2005

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2005, I electronically filed *Memorandum of Points and Authorities* with the Clerk of Court using CM/ECF. I hereby certify that on December 19, 2005I have mailed by United States Postal Service, the document to the following non-registered participant:

Ronald Proctor
SBI # 163750
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

/s/ Lisa Barchi
Lisa Barchi  # 3927
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400
lisa.barchi@state.de.us